UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

APPLICATION OF CBRE GLOBAL                  :
INVESTORS (NL) B.V., CBRE DRET              :
CUSTODIAN I B.V., CBRE DHC MAASTRICHT :          No. 20 Misc. _____
(GROTE STAAT V) B.V. and CBRE DHC DEN       :
HAAG (GROTE MARKSTRAAT V) B.V.              :
                                            :
                        Petitioners,        :
                                            :
For an Order Granting Leave to Issue Subpoenas for :
Discovery in Aid of Foreign Proceedings Pursuant  :
to 28 U.S.C. § 1782.                        :

———————————————————————— x

## MEMORANDUM IN SUPPORT OF CBRE'S APPLICATION UNDER 28 U.S.C. SECTION 1782 SEEKING DISCOVERY FOR USE IN A FOREIGN PROCEEDING

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York  10036
Telephone: (212) 715-9100

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS ....................................................................................................3

      A.    The Guarantee Litigation ..................................................................................3

      B.    HBC's Restructuring .........................................................................................5

      C.    Potential Litigation Arising from HBC's Restructuring ....................................7

      D.    CBRE's Efforts to Obtain Information Without Litigation,  and the Information CBRE Seeks in this Proceeding ...........................................................9

ARGUMENT ......................................................................................................................11

      A.    Section 1782 Is Interpreted Broadly Consistent with the Statute's Salutary Goals ...............................................................................................................11

      B.    CBRE Satisfies Section 1782's Three Statutory Prerequisites ..........................13

      C.    The Discretionary Factors Weigh In Favor of Granting CBRE's Application ....................................................................................................15

            1.    HBC US and Mr. Schwartz Are Non Participants in the Dutch Proceedings ................................................................................15

            2.    Dutch (and Canadian) Courts Are Receptive to Information Obtained Here ..........................................................................15

            3.    CBRE Is Not Attempting to Circumvent Restrictions on Foreign Proof Gathering .................................................................16

            4.    The Discovery CBRE Seeks Is Narrowly Tailored ..................................17

      D.    The Requested Discovery May Be Ordered *Ex Parte*, Without Prejudice to HBC US and Mr. Schwartz's Right to Move to Vacate or Quash ....................18

CONCLUSION ....................................................................................................................19

# **TABLE OF AUTHORITIES**

**Page**

*In re Application of Ambercroft Trading Ltd.*,
  2018 U.S. Dist. Lexis 171366 (N.D. Cal. Oct. 3, 2018) ..........................................................14

*In re Application of Atvos Agroindustrial Investimentos S.A.*,
  --- F. Supp. 3d ---, 2020 WL 4937084 (S.D.N.Y. Aug. 24, 2020) .........................................13

*In re Application of Eli Lilly & Co.*,
  2010 WL 2509133 (D. Conn. June 15, 2010)...........................................................................15

*In re Ex Parte Application of Porsche Automobil Holding SE*,
  2016 WL 702327 (S.D.N.Y. Feb. 18, 2016).............................................................................15

*In re Bayer AG*,
  146 F.3d 188 (3d Cir. 1998)....................................................................................................12

*In re Benetton Int'l, N. V.*,
  1997 WL 1068669 (E.D.N.Y. Apr. 25, 1997) .........................................................................15

*In re Bloomfield Inv. Res. Corp.*,
  2016 U.S. Dist. LEXIS 25821 (S.D.N.Y. Feb. 25, 2016)........................................................17

*In re Bloomfield Inv. Res. Corp.*,
  2018 U.S. Dist. Lexis 206338 (S.D.N.Y. Dec. 6, 2018)....................................................15, 16

*In re del Valle Ruiz*,
  939 F.3d 520 (2d Cir. 2019)...............................................................................................12, 13

*Eco Swiss China Time Ltd. v. Timex Corp.*,
  944 F. Supp. 134 (D. Conn. 1996)...........................................................................................15

*Esses v. Hanania (In re Esses)*,
  101 F.3d 873 (2d Cir. 1996)...............................................................................................11, 18

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995).....................................................................................................18

*Foden v. Gianoli Aldunate (In re Gianoli Aldunate)*,
  3 F.3d 54 (2d Cir. 1993)......................................................................................................12, 18

*Gushlak v. Gushlak*,
  486 F. App'x 215 (2d Cir. 2012) .......................................................................................11, 17

## <u>TABLE OF AUTHORITIES</u>

**Page**

*HRC-Hainan Holding Co. v. Hu*,
  2020 WL 906719 (N.D. Cal. Feb. 25, 2020), *appeal filed* (9th Cir. Mar. 4,
  2020), *stay pending appeal denied*, 2020 WL 1274877 (N.D. Cal. Mar. 17,
  2020) ...................................................................................................................14

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004)...............................................................................12, 13, 14, 17

*Mees v. Buiter*,
  793 F.3d 291 (2d Cir. 2015).........................................................................12, 14, 17

*Metallgesellschaft AG v. Hodapp (In re Application for an Order Permitting
  Metallgesellschaft AG to take Discovery)*,
  121 F.3d 77 (2d Cir. 1997)....................................................................................16, 17

*Minatec Fin. S.A.R.L. v. SI Group Inc.*,
  2008 WL 3884374 (N.D.N.Y. Aug. 18, 2008) .......................................................17

*In re Ontario Principals' Council*,
  2013 WL 6844545 (E.D. Cal. Dec. 23, 2013) ............................................14, 15, 16

*In re Qwest Communications Int'l Inc.*,
  2008 WL 2741111 (W.D.N.C. July 10, 2008)..................................................13, 15

*In re Schottdorf*,
  2006 WL 3844464 (S.D.N.Y. Dec. 28, 2006) ...............................................13, 16

*In re Top Matrix Holdings Ltd.*,
  2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) .........................................................15

*In re Wilhelm*,
  470 F. Supp. 2d 409 (S.D.N.Y. 2007).....................................................................14

*In re 28 U.S.C. § 1782*, 249 F.R.D. 96 (S.D.N.Y. 2008 ............................................17

**Statutes & Rules**

28 U.S.C. § 1782.................................................................................... *passim*

Canada Business Corporations Act, c 57, § 241 ..............................................8

British Columbia Business Corporations Act, § 227 .......................................8

Fed. R. Civ. P. 26(b) ........................................................................................17

**<u>Preliminary Statement</u>**

Petitioners CBRE Global Investors (NL) B.V., CBRE DRET Custodian I B.V., CBRE DHC Maastricht (Grote Staat V) B.V. and CBRE DHC Den Haag (Grote Markstraat V) B.V. (collectively, "CBRE") respectfully submit this memorandum of law in support of their application for discovery from HBC US Holdings LLC ("HBC US") and its General Counsel David Schwartz, in aid of foreign litigation pursuant to 28 U.S.C. § 1782.

In this proceeding, CBRE, a commercial real estate owner and operator, seeks limited discovery in connection with both pending and contemplated foreign litigation. CBRE is currently the claimant in a civil action in The Netherlands against Hudson's Bay Company ULC, a Canadian company formerly known as Hudson's Bay Company ("HBC"), who through its affiliates owns and operates department stores, including Saks Fifth Avenue, throughout the United States, Canada and Europe. In that Netherlands litigation, CBRE is seeking to enforce HBC's guarantees of HBC's former Dutch subsidiaries' rent obligations for retail space leased from CBRE in The Netherlands (the "Guarantees" and the "Guarantee Litigation"). To date, HBC has failed to satisfy its payment obligations under the Guarantee while claiming in correspondence with CBRE that HBC is in "financial distress."

Notwithstanding this "financial distress" and in the midst of litigation with CBRE and other similarly-situated landlords, HBC secretly siphoned away what appears to be billions of dollars of assets by transferring its entire United States operations to a newly-formed Bermuda parent company, under the guise of an internal restructuring (the "Restructuring") thereby removing those assets from the reach of HBC's creditors, including CBRE. That purported Restructuring bears many of the hallmarks of classic actual and constructive fraudulent transfers and raises serious questions of liability under both Canadian and Dutch law.

Given the seriousness of the transactions associated with the Restructuring, CBRE is contemplating the assertion of additional claims arising from the Restructuring, against HBC and certain of its affiliates, officers, directors and/or controlling shareholders. CBRE is considering bringing these claims in (i) The Netherlands, (ii) Canada, or (iii) another court of competent jurisdiction, for violation of Dutch and/or Canadian fraudulent transfer laws, fiduciary obligations, and other corporate oppression laws (the "Restructuring Litigation").

CBRE previously asked HBC to disclose voluntarily a narrow set of documents concerning the Restructuring and HBC's financial health and ability to satisfy creditor claims. HBC has repeatedly refused those requests. CBRE is now requesting this Court's aid to obtain those documents, together with a deposition of (i) HBC US – HBC's American subsidiary whose equity interests were transferred away from HBC as part of the Restructuring, and (ii) HBC's General Counsel, David Schwartz, whom CBRE believes is knowledgeable concerning these transactions. The discovery that CBRE seeks is for use in both the Guarantee Litigation and Restructuring Litigation. All this information is located and/or accessible here in New York because both HBC US and Mr. Schwartz maintain offices here.

As described below, CBRE satisfies the three elements of 28 U.S.C. § 1782: (i) CBRE seeks discovery from individuals or entities in this district; (ii) the discovery is for use in foreign proceedings; and (iii) this application is made by a party to those foreign proceedings. CBRE also satisfies the four discretionary factors that courts consider under the statute: (i) the discovery is not sought from the counterparty in the foreign proceeding; (ii) The Netherlands is receptive to discovery obtained pursuant to 28 U.S.C. § 1782, as is Canada, the other potential forum; (iii) the request does not circumvent foreign proof-taking restrictions; and (iv) the request is not unduly burdensome. CBRE believes that at least some of the documents requested here

have been produced by HBC in a litigation brought in the Southern District of New York by Wilmington Trust, N.A. – another Hudson's Bay creditor – who sued HBC on the grounds that HBC's Restructuring violated financial covenants in agreements between HBC and Wilmington Trust (the "Wilmington Trust Litigation").

## Statement of Facts

The facts set forth below are based on the petition submitted with this memorandum, and the declarations of (i) David Heems, counsel to CBRE in The Netherlands, (ii) Anne Posno, Canadian counsel to CBRE, and (iii) Jonathan M. Wagner of Kramer Levin Naftalis & Frankel LLP, counsel to CBRE in this proceeding, along with documents referenced in those declarations.

**A.    The Guarantee Litigation**

Originally founded in 1670 as a fur trade company, Hudson's Bay has evolved into a world-wide owner and operator of retail department stores, known for operating such brands as Saks Fifth Avenue, Hudson's Bay, and until 2019, Lord & Taylor.  *See* Wagner Decl. Exh. 3, ¶ 2.

In 2016, HBC announced that it intended to introduce the Hudson's Bay chain of department stores to The Netherlands.  Between January and August 2017, CBRE leased four department store locations in The Netherlands to HBC Netherlands B.V. ("HBC NL") for a term of not less than 20 years (the "Leases").  Heems Decl. ¶ 3.  At the time, HBC was a public company and the ultimate parent company that directly and/or indirectly owned the equity interests in the subsidiaries that owned and operated its European businesses (including HBC NL), its Canadian businesses and its United States businesses (including HBC US) (collectively, the "HBC Group").  Wagner Decl. Exh. 3, ¶ 8.

HBC agreed to guarantee HBC NL's obligations under the Leases and for compensation of any loss resulting from the early termination of the leases, by means of certain corporate and parent company guarantees. Furthermore, one of the HBC's affiliates, HBC Europe S.á r.l. ("HBC Europe"), had issued a general guarantee in respect of all of HBC NL's liabilities (the "Guarantees"). Heems Decl. ¶ 5.

After HBC failed timely to issue two of the required Guarantees and HBC Europe withdrew its general guarantee, CBRE successfully commenced legal proceedings against HBC in The Netherlands in 2019, demanding the issuance of these two remaining Guarantees and resisting withdrawal of the general guarantee. That matter was settled under a Settlement Agreement in June 2019, pursuant to which HBC issued the required Guarantees. *Id.* ¶ 6 & Exh. 1.

Only a few months later, in August 2019 HBC announced its intent to shut down its operations in The Netherlands. On November 28, 2019 HBC NL was granted a provisional suspension payments by the Amsterdam District Court. On December 31, 2019, the provisional suspension of payments was withdrawn and HBC NL was declared bankrupt. On February 29, 2020, the Leases (as well as other leases associated with HBC's Netherlands' operations and guaranteed by HBC) were terminated by the bankruptcy trustees as part of those bankruptcy proceedings, causing CBRE to incur a significant financial loss estimated to be in excess of €69 million. *Id*. ¶ 7.

On March 23, 2020, shortly after the HBC NL leases were terminated, CBRE demanded from HBC payment on the Guarantees. Posno Decl. Exh. 1. Although HBC had previously acknowledged its liability under the Guarantees in its publicly filed financial statements, HBC nevertheless refused to pay, claiming that it was in financial distress. In the

words of its lawyer, HBC was in "serious financial dire straits," and based on that alleged circumstance demanded CBRE "not [to] take any further action against HBC." HBC also claimed that all its leases in The Netherlands, not only those with CBRE, had allegedly been procured through anti-competitive activity. Posno Decl. Exh. 2. CBRE contends that HBC's justifications and arguments are meritless, pretextual, and not grounds to delay CBRE's payment obligations. Heems Decl. ¶ 8.

On April 20, 2020, CBRE commenced the Guarantee Litigation against HBC to enforce its Guarantees. *Id.* ¶ 9. The complaint recites the above history, including that HBC has refused to honor its payment obligations under the Guarantees while claiming in its correspondence with CBRE that it was "'in dire financial straits.'" Wagner Decl. Exh. 1, ¶ 2.10.4. CBRE alleges that HBC's anti-competitive claim is bogus and merely intended to delay. *Id.* ¶ 2.10.05. CBRE similarly alleges that "The fear that HBC is avoiding the fulfillment of its obligations, and in any event postponing them, is further amplified by HBC's corporate restructuring ('going private')" and that on account of that restructuring "a significant part of HBC's assets has been lost." *Id.* ¶ 2.10.6.

**B.    HBC's Restructuring**

In October 2019, while in the process of shutting down its Netherlands operations and facing the prospect of at minimum tens of millions of dollars in guarantee obligations resulting from that shutdown, HBC publicly announced that it had entered into an agreement with a group of HBC shareholders to take the company private. This transaction is described in a May 23, 2020, declaration of Ian Putnam, HBC's Chief Corporate Development Officer, submitted by HBC in the Wilmington Trust Litigation. Wagner Decl. Exh. 3. The transaction was completed on March 3, 2020. *Id.* ¶ 7.

Prior to going private, HBC was a public company organized under Canadian law and served as the top-level holding company of the entire HBC Group.  As such, HBC – CBRE's guarantor – owned directly or indirectly all of HBC's international businesses, including HBC US, the holding company of HBC's American subsidiaries.  *Id.* ¶ 8.

As part of the going private transaction, HBC's new private owners restructured the business, purportedly to "optimize their Canadian and foreign (including the United States) operations and assets from a tax perspective."  *Id.* ¶ 9.  A new top level holding company was created – Hudson's Bay Company LP, a Bermuda entity ("HBC Bermuda").  As a result of these transactions, HBC, which was converted to a British Columbia entity and renamed Hudson's Bay Company ULC, no longer owns HBC US.  *Id.* ¶¶ 9-17.  Mr. Putnam recites that as part of the transaction, "HBC's United States assets and operations were transferred to HBC Bermuda." *Id.* ¶ 17.  HBC did not disclose this transfer to CBRE.  HBC US was also converted to an LLC.

According to Mr. Putnam's declaration and based on May 2020 preliminary unaudited financial statements, HBC Bermuda owns approximately $7.4 billion in assets as compared to HBC's $3.3 billion in assets – implying that the HBC US assets transferred to HBC Bermuda at a time when HBC was financially distressed had a value of approximately $4.1 billion.  *Id.* ¶ 17.  Unless these transfers are unwound, avoided or otherwise modified, CBRE may not be able to look to HBC's American assets to satisfy its Guarantees.

**C.**    **Potential Litigation Arising from HBC's Restructuring**

In addition to assessing HBC's conduct in connection with the Guarantee Litigation and whether its efforts to frustrate any judgment there gives rise to remedies in that litigation, CBRE is contemplating the assertion of claims in either The Netherlands or Canada against HBC, its affiliates (including HBC Bermuda), officers, directors and/or controlling shareholders. The claims in the potential jurisdictions would be as follows:

The Netherlands: Under Dutch law, creditors can commence an *Actio Pauliana* – either by an extra-judicial declaration to the debtor or by an application to set aside a fraudulent preference — to have declared as void acts of their debtors that are prejudicial to creditors. Heems Decl. ¶ 14. To prevail under an *Actio Pauliana* action, a creditor must show (i) the relevant act was taken voluntarily and not required by law or contract, (ii) the act must prejudice the recourse of creditors, and (iii) when, as appears here, the transfer was made without consideration, the debtor should have known that the transaction was prejudicial to the debtor's creditors. The debtor is suspected to have such knowledge if (a) the transfer was entered into by two entities within the same group of entities, as is currently the case, or (b) a transfer that is made without consideration occurred within one year of the creditor declaring it void, as currently appears to be the case. It is then up to the debtor to prove that it did not know and should not have known that the transfer was prejudicial to its creditors. *Id.* ¶ 14. [1]

Here, it appears that without disclosure to CBRE, HBC voluntarily and not under the compulsion of law or contract effectively dividended $4.4 billion of assets in the form of 100 percent of the equity of HBC US, which housed HBC's entire United States operations. HBC

---

[1] The act/transfer may be declared void by the creditor via an "informal declaration" – for example, a letter or email. If that declaration is contested, then the creditor must commence a proceeding to obtain a judgment that its declaration was valid and that the act/transfer was annulled by declaration. *Id.* ¶ 14 n.1.

did so at a time when HBC was in financial distress and facing tens of millions of guarantee obligations resulting from the cessation of its Netherlands operations.  Assuming that is the case, nothing could be more prejudicial to the recourse of HBC's creditors.  CBRE is thus considering bringing an *Actio Pauliana* to set aside HBC's transfer of its interests in HBC US.  *Id.* ¶ 14.

Canada:   Under Canadian law, creditors can commence an action to void a transfer as fraudulent when that transfer was made with intent to defeat, hinder, delay or defraud creditors of their actions or debts.  Posno Decl. ¶ 10.  Evidence of insolvency or near insolvency, absence of consideration, and transactions undertaken not at arms' length – all of which are present here –are considered supportive of fraudulent intent under Canadian law.  *Id.*

In addition, Section 227 of the British Columbia *Business Corporations Act*, SBC 2002, c 57, and Section 241 of the Canada Business Corporations Act, allow stakeholders such as CBRE to seek relief when the affairs of a company are being conducted in a manner that is oppressive, unfairly prejudicial to and/or unfairly disregards the interests of the stakeholder. Posno Decl. ¶ 11.

CBRE reasonably expected that during this period of severe financial distress and otherwise, HBC would be managed by its directors in accordance with their obligations to act honestly and in good faith in the best interests of HBC, taking into account the interests of all stakeholders, including the interests of CBRE.  The Guarantees were used to induce CBRE to enter into the Leases with the expectation that CBRE could enforce the obligations under the Leases against HBC and its assets, including the equity of HBC US that was apparently siphoned away for no consideration.  CBRE may contend that these circumstances constitute oppressive and prejudicial conduct by HBC and its officers, directors and/or shareholders that has breached CBRE's reasonable expectations.  *Id.* ¶ 12.

CBRE may likewise contend that the officers and directors breached their fiduciary duties by among other things authorizing or acquiescing to the effective transfer of $4.1 billion of assets from HBC to HB Bermuda for what appears to be no consideration and at a time when HBC was financially distressed.  If so, then the officers and directors may have disregarded the interests of CBRE in favor of other stakeholders.  CBRE may also allege that the shareholders of HBC knowingly induced, encouraged, assisted, participated in or benefitted from these breaches of fiduciary duties.  *Id.* ¶ 13.  In light of these circumstances, CBRE may seek appropriate relief against HBC as well as its affiliates, officers, directors, and/or shareholders.

**D.    CBRE's Efforts to Obtain Information Without Litigation,
         and the Information CBRE Seeks in this Proceeding**

CBRE endeavored to avoid this litigation by requesting, on no less than three occasions, that HBC voluntarily disclose information concerning its financial status and the Restructuring.  Regrettably, HBC has declined those requests.

First, on May 20, 2020 CBRE's Dutch counsel wrote to his counterpart and requested that HBC provide "proper insight into its financial data by way of a current financial statement from an independent auditor or other reliable and satisfactory disclosure."  Heems Decl. Exh. 2.  HBC did not provide the information.  Heems Decl. ¶ 17.  Next, on June 29, 2020 CBRE's Dutch counsel again wrote to his Dutch counterpart and to HBC's General Counsel, David Schwartz.  In that letter, CBRE raised questions concerning the impact of the Restructuring on HBC's ability to pay creditors such as CBRE.  CBRE also noted that the Restructuring had already been the subject of litigation – the Wilmington Trust Litigation.  CBRE's letter requested documents from HBC, as follows:

> In order to assess the impact of the Transactions [i.e., the Restructuring] on CBRE, CBRE requires the following information about the Transactions:

    a.   Financial statements from both HBC and other relevant parties to the Transactions that show the details and effects of the Transactions.  These statements should at least include balance sheets (i) of the day before the Transactions took place, (ii) of the day after the Transactions took place (opening balance sheet), and (iii) pertaining to HBC's current financial position.

    b.   Organizational charts for HBC and its affiliates both immediately prior to, and after giving effect to, the Transactions.

    c.   Any legal or other opinions issued in connection with the Transactions, including any fairness or insolvency opinions.

    d.   All transactional documentation pertaining to the Transactions, including any and all corporate authorizations and resolutions.

    e.   A current solvency statement with respect to HBC.

*Id*. ¶ 18 & Exh. 3.

HBC Dutch counsel responded by email to CBRE's Dutch counsel on July 6. Rather than provide the documents, HBC's counsel replied: "You are invited to explain the legal basis of your request.  Please bear in mind that we do at present not represent HBC L.P. (Bermuda) and are not involved in the litigation you mention."  Heems Decl. Exh. 4.

CBRE's American counsel responded on July 10, explaining that the basis for CBRE's request was its concern as to the impact of the Restructuring on HBC's ability to pay creditors, and that the Restructuring appeared to be a fraudulent transfer.  CBRE's counsel also noted that a letter filed in the Wilmington Trust Litigation indicated that HBC had already produced virtually identical information in that case.  CBRE also offered to engage directly with HBC's American or Canadian counsel:

As set forth in a joint initial pre-trial conference letter [in the Wilmington Trust litigation] (attached here for ease of reference), HBC indicated that it has produced dozens of documents and financial statements to the plaintiffs and has also offered, on multiple occasions, to explain the "internal restructuring" to the plaintiffs.

We are simply seeking similar information and opportunities for discussion that HBC has offered the plaintiffs in that action and would like to understand how that "internal

restructuring" has not harmed CBRE, particularly given that, unlike the plaintiffs there, HB Bermuda has <u>not</u> separately guaranteed HBC's obligations to CBRE.

We assume that HBC would prefer to have this dialog informally and outside of litigation.

Please let us know by July 14 whether HBC will comply with this request. We are happy to engage directly with HBC's and HB Bermuda's U.S. and/or Canadian counsel.

Wagner Decl. Exh. 4. HBC did not agree to the request.

CBRE's proposed subpoenas in this action seek documents that are similar to at least some of the material produced in the Wilmington Trust Litigation. CBRE also seeks a deposition of HBC US by a corporate designee and of Mr. Schwartz so that CBRE can learn about HBC's financial status and the reasons for and consequences of the Restructuring. That too is similar to what HBC offered to provide to Wilmington Trust. *Compare* Wagner Decl. Exhs. 6-8, *with id.* Exh. 5 at page 3.

## <u>Argument</u>

## <u>THE COURT SHOULD GRANT CBRE'S PETITION PURSUANT TO 28 U.S.C. § 1782</u>

As demonstrated below, CBRE has met the statutory requirements under Section 1782. The discretionary Section 1782 factors likewise weigh strongly in favor of this application.

**A.**  <u>Section 1782 Is Interpreted Broadly Consistent with the Statute's Salutary Goals</u>

To obtain discovery under 28 U.S.C. § 1782, an applicant must first establish three basic statutory prerequisites: (1) the discovery is sought from a person or entity residing or found in this district, (2) the discovery is for use in a proceeding before a foreign tribunal, and (3) the applicant is an interested person before such foreign tribunal. *Gushlak v. Gushlak,* 486 F. App'x 215, 218 (2d Cir. 2012); *Esses v. Hanania (In re Esses),* 101 F.3d 873, 875 (2d Cir. 1996).

The United States Supreme Court has held that if those prerequisites are satisfied, then the Court should next consider several discretionary factors:  whether (1) the person from whom discovery is sought is a participant in the foreign proceeding (in which case the foreign tribunal has jurisdiction over the person and can itself order that person to produce evidence), (2) the foreign tribunal is receptive to United States court assistance, (3) the request seeks to circumvent foreign proof-taking restrictions, and (4) the request is unduly intrusive or burdensome.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 255-56 (2004).

Congress intended Section 1782 to be "interpreted broadly" (*In re del Valle Ruiz*, 939 F.3d 520, 527 (2d Cir. 2019)) in support of "twin aims" of "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Mees v. Buiter,* 793 F.3d 291, 297-98 (2d Cir. 2015).  *See also Foden v. Gianoli Aldunate (In re Gianoli Aldunate),* 3 F.3d 54, 57 (2d Cir. 1993) (quoting S. Rep. No. 88-1580, at *7, reprinted in* 1964 U.S.C.C.A.N. 3782) (Section 1782 was intended "to clarif[y] and liberalize . . . existing U.S. procedures for assisting foreign and international tribunals and litigants in obtaining oral and documentary evidence in the United States").

"Consistent with the statute's modest prima facie elements and Congress's goal of providing equitable and efficacious discovery procedures, district courts should treat relevant discovery materials sought pursuant to § 1782 as discoverable *unless* the party opposing the application can demonstrate facts sufficient to justify the denial of the application." *In re Bayer AG,* 146 F.3d 188, 195 (3d Cir. 1998) (emphasis added); *see also id.* at 196 ("[R]elevant evidence is presumptively discoverable under Section 1782.").  And as long as the subpoenaed party is present in this district, that party may be ordered to produce documents, even if some of

- 12 -

the documents requested may be located outside this district or even outside the country.  *In re del Valle Ruiz*, 939 F.3d at 533 (ruling that Section 1782 "allows extraterritorial discovery"); *accord In re Schottdorf,* 2006 WL 3844464, at *5 (S.D.N.Y. Dec. 28, 2006).

CBRE's application meets all the statutory requirements, and all the discretionary factors likewise support CBRE's application.

**B.      CBRE Satisfies Section 1782's Three Statutory Prerequisites**

CBRE meets all the statutory criteria.  First, HBC US resides in the district and maintains an office here.  And it is CBRE's understanding that Mr. Schwartz also resides here, and works out of HBC's offices on Fifth Avenue.  Wagner Decl. Exhs. 9 and 10.

Second, the discovery sought is "for use" in connection with the Guarantee Litigation.  *See, e.g., In re Application of Atvos Agroindustrial Investimentos S.A.*, --- F. Supp. 3d ---, 2020 WL 4937084, at *6 (S.D.N.Y. Aug. 24, 2020) (holding that the burden on an applicant to show that the requested discovery is "for use" in the foreign proceeding is "*de minimis*").  The Guarantee Litigation is pending in the District Court of Amsterdam, a Dutch trial court qualifying as a "foreign tribunal."  *See Intel,* 542 U.S. at 257-58 (tribunals include courts that are "first-instance decisionmakers"); *In re Qwest Communications Int'l Inc.,* 2008 WL 2741111, at *4 (W.D.N.C. July 10, 2008) ("courts have routinely held that the courts of the Netherlands are 'tribunals' under Section 1782.") (citation omitted).

The contemplated Restructuring Litigation in either The Netherlands or Canada also qualifies under Section 1782 as "for use" in a foreign tribunal.  "Section 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings."  *Intel,* 542 U.S. at 258.  Rather, "[T]he 'proceeding' for which discovery is sought under § 1782(a) must be in reasonable contemplation, but need not be 'pending' or 'imminent.'"  *Id.* at 247, 259.

- 13 -

Here, and as described in the supporting declarations, CBRE has taken numerous preparatory steps with respect to such litigation, including retaining Dutch and Canadian counsel for a potential claim, determining the specific claims that may be brought and identifying the specific defendants, including entities, officers, directors and/or shareholders. The Restructuring Litigation is therefore in CBRE's "reasonable contemplation" and qualifies as a proceeding under Section 1782. *See, e.g., Mees,* 793 F.3d at 295 (granting Section 1782 request when applicant reasonably contemplated suit in The Netherlands); *In re Wilhelm,* 470 F. Supp. 2d 409, 411 (S.D.N.Y. 2007) (same); *In re Ontario Principals' Council,* 2013 WL 6844545, at *3 (E.D. Cal. Dec. 23, 2013) (granting 1782 request of applicant who intended to commence defamation action in Canada); s*ee also HRC-Hainan Holding Co. v. Hu,* 2020 WL 906719 (N.D. Cal. Feb. 25, 2020) (allowing discovery pursuant to Section 1782 relating to fraudulent transfer claims) *appeal filed* (9th Cir. Mar. 4, 2020), *stay pending appeal denied*, 2020 WL 1274877 (N.D. Cal. Mar. 17, 2020); *In re Application of Ambercroft Trading Ltd.*, 2018 U.S. Dist. Lexis 171366 (N.D. Cal. Oct. 3, 2018) (same).

Third, CBRE is an "interested person" as a party to the Guarantee Litigation and the contemplated plaintiff in the Restructuring Litigation. *See, e.g., Intel Corp.,* 542 U.S. at 256 ("No doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782. . . ."); *In re Ontario Principals' Council,* 2013 WL 6844545, at *3 (a person intending to commence a suit in a foreign proceeding is an "interested persons" under Section 1782).

In short, CBRE's application meets all the statutory prerequisites.

**C.**     **The Discretionary Factors Weigh In Favor of Granting CBRE's Application**

           *1.  HBC US and Mr. Schwartz Are Non Participants in the Dutch Proceedings.*

        Neither HBC US nor Mr. Schwartz is a litigant before the Dutch Court.  That they have corporate affiliations to a litigant in The Netherlands is of little moment, because they have no known nexus to The Netherlands and are likely beyond the Dutch Court's subpoena powers. *See In re Ex Parte Application of Porsche Automobil Holding SE*, 2016 WL 702327, at *2 (S.D.N.Y. Feb. 18, 2016) (In Section 1782 application, rejecting argument that affiliates or individuals related to a party – in that case general partners and investment managers of the litigant – are before the foreign court); *In re Top Matrix Holdings Ltd.,* 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020) (In Section 1782 application, holding that affiliates and personnel "have separate legal personalities" from the litigant).

           *2.  Dutch (and Canadian) Courts Are Receptive to Information Obtained Here*

        "The courts in the Netherlands have been historically receptive to requests for assistance by the courts of the United States."  *In re Qwest Communications Intl.,* 2008 WL 2741111, at *5; *see also In re Bloomfield Inv. Res. Corp.*, 2018 U.S. Dist. Lexis 206338, at *14 (S.D.N.Y. Dec. 6, 2018) ("the regularity with which U.S. courts grant similar Section 1782 discovery requests for Dutch litigation also suggests that there is little potential offensiveness to such grants") (collecting citations); *accord Eco Swiss China Time Ltd. v. Timex Corp.,* 944 F. Supp. 134, 138  (D. Conn. 1996) (permitting discovery for use in proceedings in District Court of The Hague, Netherlands); *In re Benetton Int'l, N. V.,* 1997 WL 1068669, at *1 (E.D.N.Y. Apr. 25, 1997) (granting Section 1782 application when litigants were engaged in "judicial . . . proceedings in the Netherlands").  *See also In re Application of Eli Lilly & Co.*, 2010 WL 2509133, at *4 (D. Conn. June 15, 2010) (granting discovery in aid of a then-pending Canadian patent infringement dispute); *In re Ontario Principals' Council,* 2013 WL 6844545,

at *3 (granting Section 1782 request of applicant who intended to commence defamation action in Canada).

Conversely, "absent authoritative proof that a foreign tribunal would reject the evidence obtained with the aid of section 1782 . . . a district court should not refrain from granting the assistance afforded under the Act based simply on allegations to that effect." *Metallgesellschaft AG v. Hodapp (In re Application for an Order Permitting Metallgesellschaft AG to take Discovery)*, 121 F.3d 77, 80 (2d Cir. 1997) (quotation omitted). *See also In re Bloomfield Inv. Res. Corp.*, 2018 U.S. Dist. Lexis 206338, at *12 (in the absence of "a foreign judicial, executive, or legislative body . . . expressly and clearly [making an objection] known," district courts should conclude they are receptive to discovery obtained with the aid of Section 1782). The declarations from CBRE's Dutch and Canadian counsel together with Section 1782 precedent establish the receptivity of Dutch and Canadian courts to discovery obtained here. *See* Heems Decl. ¶ 21; Posno Decl. ¶ 15, and cases cited above.

3. *CBRE Is Not Attempting to Circumvent Restrictions on Foreign Proof Gathering*

This application is not an attempt to circumvent foreign proof-gathering restrictions or other policies of The Netherlands or Canada. In sharp contrast, CBRE is undertaking a good faith effort to access probative and relevant evidence for use in the Guarantee Litigation and the anticipated Restructuring Litigation. When as here the foreign tribunal likely lacks jurisdiction to compel the respondent to provide evidence and applicants are not seeking to use Section 1782 for abusive purposes, the third *Intel* prong is satisfied. *See, e.g., In re Schottdorf,* 2006 WL 3844464, at *7 ("Absent any indication of bad faith" an attempt to acquire discovery unavailable abroad is not "a vehicle to end-run foreign proof-gathering restrictions.");

*Minatec Fin. S.A.R.L. v. SI Group Inc.,* 2008 WL 3884374, at *8 (N.D.N.Y. Aug. 18, 2008) ("The primary issue for us is whether [applicant] is pursuing this discovery in bad faith.").

Notably, this factor does not require a showing that the applicant has attempted to obtain the requested information from the foreign tribunal.  *See, e.g. Mees,* 793 F.3d at 303 (rejecting a "quasi-exhaustion requirement," under Section 1782; the Court "finds no support in the plain language of the statute and runs counter to its express purposes") (quoting and citing *Metallgesellschaft*, 121 F.3d at 79); *accord In re Bloomfield Inv. Res. Corp.*, 2016 U.S. Dist. LEXIS 25821, at *6-7 (S.D.N.Y. Feb. 25, 2016).  CBRE therefore does not need to try first to obtain these materials through the Dutch courts prior to filing a Section 1782 discovery request. *Id*. (rejecting respondent's argument that the Section 1782 application at issue was "merely an end run around Netherlands discovery rules").  Nor does Section 1782 require that the evidence sought be discoverable in the foreign tribunal.  *Intel*, 542 U.S. at 247, 253, 259-62 (rejecting a foreign discoverability prerequisite); *Mees*, 793 F.3d at 303 n.20 ("That a country does not enable broad discovery within a litigation does not mean that it has a policy that restricts parties from obtaining evidence through other lawful means.").

Because this application may be the only practical way for CBRE to obtain relevant evidence from parties located here in New York (Heems Decl. ¶ 20, Posno Decl. ¶ 14), its application is not being pursued in bad faith as a vehicle to circumvent foreign law.

### 4.   *The Discovery CBRE Seeks Is Narrowly Tailored*

Like all federal discovery, the proper scope of discovery under Section 1782 is governed by Federal Rule of Civil Procedure 26(b).  *Mees*, 793 F.3d at 302; *In re 28 U.S.C. § 1782*, 249 F.R.D. 96, 106 (S.D.N.Y. 2008).  District Courts thus retain "broad authority . . . to

fashion discovery orders issued pursuant to section 1782." *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1101 (2d Cir. 1995) (citation omitted).

CBRE's discovery requests are narrowly tailored to seek only information likely to be relevant to the Guarantee Litigation and the contemplated Restructuring Litigation.  And since at least some of the documents that CBRE seeks appear to have been produced in the Wilmington Trust Litigation, the burden of production should be minimal.  *Compare* Wagner Decl. Exhs. 6-8, *with id.* Exh. 5 at page 3.  Finally, the two depositions requested by CBRE do not add materially to the burden.

**D.      The Requested Discovery May Be Ordered *Ex Parte*, Without Prejudice
to HBC US and Mr. Schwartz's Right to Move to Vacate or Quash**

Section 1782 orders are frequently issued on an *ex parte* basis, without prejudice to the rights of the subpoenaed persons to file a motion to vacate or quash.  *See, e.g., In re Esses*, 101 F.3d at 874 (affirming grant of *ex parte* order under Section 1782); *In re Application of Gianoli,* 3 F.3d 54, 55 (2d Cir. 1993) (same); *Gushlak,* 486 F. App'x at 217 ("it is neither uncommon nor improper for district courts to grant applications made pursuant to § 1782 *ex parte*.").  The Court should grant CBRE's *ex parte* application without prejudice to the rights of HBC US and Mr. Schwartz to move to vacate or quash.

## Conclusion

For these reasons, CBRE respectfully requests that the Court grant its petition for discovery in aid of foreign litigation.

Dated:   New York, New York
          September 4, 2020

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: /s/  Jonathan M. Wagner
          Jonathan M. Wagner
          Daniel M. Eggermann
          Natan M. Hamerman

1177 Avenue of the Americas
New York, New York  10036
(212) 715-9100

*Attorneys for Petitioners*